SCOTT A. DEFOE
Exhibit 130
06/19/2025

On-Scene Consulting

June 2, 2025

Mr. David C. Washington, Esq.
Ms. Rebecca Brown, Esq.
Hadsell, Stormer, Renick & Dai LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103

**Federal Rules of Civil Procedure 26 (a) (2) (B) Supplemental Report**

**MATILDE GARZA, INDIVIDUALLY, AND AS SURVIVING HEIR AND SUCCESSOR IN INTEREST OF ANTONIO F. GARZA, JR., (DECEASED), Plaintiff,**
**vs.**
**COUNTY OF SAN BERNARDINO, BILL ABERNATHY; NICHOLAS KRIDNER; AND DOES 1, 3-9, Defendants.**
**Case No. 23-cv-01849-CBM-SP.**

Dear Mr. Washington and Ms. Brown,

Thank-you for retaining me to analyze and render opinions regarding the February 5, 2023, Deputy-Involved Shooting incident at the I-10 West, East of Whitewater Exit, which involved San Bernardino County Sheriff's Department, Deputy Sheriff Bill Abernathy, #13847 and Deputy Sheriff Nicholas Kridner, H9017, that resulted in the death of Mr. Antonio F. Garza Jr. Pursuant to the requirements of Rule 26, I have studied reports, audio-recordings, San Bernardino County Sheriff's Department documents, Transcriptions of Digitally Recorded Depositions, and other material (as listed under Materials Reviewed) provided to me thus far regarding this case. Please be advised that if additional documents related to this matter are provided, it may be necessary to write a supplemental report in order to refine or express additional opinions.

Scott A. DeFoe
Principal
On-Scene Consulting, LLC

**Materials Reviewed:**

1. Complaint for Damages, Case No. 23-cv-01849.

2. MVARS Clip, Confidential, 020523, (2:01), (RSD 001149).

3. Riverside County Sheriff's Office, Officer-Involved Shooting/Fatal, 2/5/23, R.S.O. Case No. MB230360001, SBSD Case No. 6023000111, (Non-Party RSD 000001-1118).

4. Deposition Transcript and Exhibits of Alba Stafford taken on November 14, 2024.

5. San Bernardino County Employment Application, Deputy Sheriff Trainee Nicholas D. Kridner, ID No. 29727332, (Garza-SBD-067845-067850).

6. San Bernardino County Employment Application, Deputy Sheriff Bill Dean Abernathy, ID No. 29727332, (Garza-SBD-067838-67844).

7. San Bernardino County Sheriff's Department Manual, Use of Force Policy, (Garza-SBD-064907-064919).

8. San Bernardino County Sheriff's Department, Crime Report, DR No. 092100209, (Garza-SBD-0674920-064934).

9. Riverside County Sheriff's Department, Message from CLETS, Garza, Antonio, (Garza-SBD-064935-064937).

10. Deposition Transcript and Exhibits of Dustin Caudle taken on December 11, 2024.

11. San Bernardino County Sheriff's Department Manual, Vehicle Pursuits, (Garza-SBD-001625-1648).

12. San Bernardino County Sheriff's Department Range, 11/21-2/22, Scenario Training, High Speed Vehicle Pursuits, Sheriff's Training Division, (Garza-SBD-0009503/005597-5635).

13. San Bernardino County Sheriff's Department, 2nd Trimester, 2021-2022, Continuing Professional Training, (CPT), 1st Trimester, 2021/2022, Master Book, (Garza-SBD-007752-8038/0926-1467).

14. San Bernardino County Sheriff's Office, Section 1, Course Outline, 29580, Use of Force, PSP, 4 Hours, 11/21-2/22, (Garza-SBD-09265-9271).

15. San Bernardino County Sheriff's Office, Department Manual, 3.180, Mental Health Crisis Intervention Team, (Garza-SBD-067486-067490).

16. San Bernardino County Sheriff's Department, Crisis Intervention Team Manual, Department Manual/Instruction Guide, Revised 8/2015, (Garza-SBD-064938-064962).

17. San Bernardino County Sheriff's Department, Department of Behavioral Health, Crisis Intervention Training Program, De-Escalation and Tactics, (Garza-SBD-067851-067858).

18. San Bernardino County Sheriff's Department, Classroom, 00300, Advanced Officer Course, Tactical Communications, (Garza-SBD-038580-038785).

19. Deposition Transcript and Exhibits of Joella Jimenez taken on January 15, 2025.

20. Deposition Transcript and Exhibits of Alexander Camacho taken on October 18, 2024.

21. Non-Confidential Deposition Transcript and Exhibits of Moises Cornejo taken on October 24, 2024.

22. Confidential Deposition Transcript and Exhibits of Moises Cornejo taken on October 24, 2024.

23. Deposition Transcript and Exhibits of Captain Robert Warrick taken on November 13, 2024.

24. Deposition Transcript and Exhibits of Deputy Bill Abernathy taken on October 2, 2024.

25. Non-Confidential Deposition Transcript and Exhibits of Nicholas Kridner taken on October 3, 2024.

26. Confidential Deposition Transcript and Exhibits of Nicholas Kridner taken on October 3, 2024.

27. SBSD Course Outlines
- Vehicle Stops (1-13), (Bates 539-551).
- Background Investigations (27-30), (Bates 565-568).
- Ballistic Shield Operators Course (31-44), (Bates 569-582).
- CSI Training Unit – Gunshot Trajectory Reconstruction Outline (53-54), (Bates 591-592).
- Courtroom Procedures (55-57), (Bates 593-595).
- Digital Image Processing (58-64), (Bates 596-602).
- Crime Scene Interpreting Impression Evidence (64-68), (Bates 602-606).
- Identification, Collection, and Preservation of Evidence (69-70), (Bates 607-608).
- Crisis Intervention Team (71-77), (Bates 609-615).
- Crisis Intervention Behavioral Health Training for Field Officers (78-81), (Bates 616-619).
- PIT Intervention Technique (1113-1118), (Bates 1651-1656).
- Electronic Weapons/Taser (1119-1126), (Bates 1657-1664).
- Firearms Instructor (1361-1368), (Bates 1899-1906).
- Force Options Simulator Course – PSP (1369-1372), (Bates 1907-1910).
- Use of Force (1495-1508), (Bates 2033-2046).
- Patrol Techniques (1610-1613), (Bates 2148-2151).
- Crimes in Progress (1735-1739), (Bates 2273-2277).
- Firearms/Chemical Weapons (1936-1947), (Bates 2474-2485).
- People with Disabilities (2086-2091), (Bates 2624-2629).
- Arrest and Control (2162-2165), (Bates 2700-2703).
- Driver Awareness (2166-2169), (Bates 2704-2707).

28. Training Website Screengrabs
- Screengrab of SBSD Advance Officer Training Website (14-26), (Bates 552-564).
- Screengrab of SBSD Basic Academy Website (45-52), (Bates 583-590).

29. Full SBSD Department Manual (82-1112), (Bates 620-1650).

Includes: Lethal Force Encounters and Review Policies, (857-874), (Bates 1395-1412).

30. POST Learning Domains
- POST Learning Domain No. 35 (in effect at time of incident), (1127-1360), (Bates 1665-1898).
- POST Learning Domain No. 20 (1373-1494), (Bates 1911-2032).
- POST Learning Domain No. 21 (1509-1609), (Bates 2047-2147).
- POST Learning Domain No. 23 (1614-1734), (Bates 2152-2272).
- POST Learning Domain No. 35 (updated after incident) (1740-1935), (Bates 2278-2473).

- POST Learning Domain No. 37 (1948-2085), (Bates 2486-2623).

31. SBSD Military Equipment Report for C/Y 2022 (2092-2686), (Bates 2630-3224).

32. SBSD Morongo Basin Station Manual (2149-2161), (Bates 2687-2699).

33. Deposition Transcripts and Exhibits of Bill Abernathy, Volume II, taken on January 28, 2025.

34. Deposition Transcript of Samuel Fisk taken on February 4, 2025.

35. Deposition Transcript and Exhibits of Nicholas Kridner, Volume II, taken on January 29, 2025.

36. Deposition Transcript and Exhibits of Michael Warrick taken on January 3, 2025.

37. County of San Bernardino Reponses to Plaintiff Matilde Garza's Interrogatories, Set Two, Case No. 23-cv-01849.

38. Bystander Video, (GARZA0226), (0:56).

39. Deposition Transcript of Joela Jimenez taken on January 2, 2025.

**Additional Materials Reviewed**

1. San Bernardino County Sheriff's Department Personnel Records, Bill Abernathy, (ABERNATHY 0001-286).

2. San Bernardino County Sheriff's Department Specialized Investigation Division Detail, Lethal Force Encounter, H# 2024-02, DR No. 092400031, (KRIDNER 00001-2838).

3. San Bernardino County Sheriff's Department Personnel Records, Nicholas Kridner, (ABERNATHY 04730-5094).

**California POST Basic Learning Domains as Follows:**

1. #1: "Leadership, Professionalism and Ethics."
2. #2: "Criminal Justice System."
3. #3: "Policing in the Community."
4. #19: "Vehicle Operations."
5. #20: "Use of Force."
6. #21: "Patrol Techniques."
7. #23: "Crimes in Progress."
8. #33: "Arrest and Control."
9. #34: "First Aid, CPR, and AED."
10. #35: "Firearms/Chemical Agents."
11. #37: "People with Disabilities."

**Summary**

The following statement summaries represent documents/statements that were used in part during my review but are in no way meant to be exhaustive. The documents listed in the Materials Reviewed Section of this report represent the full library of documents reviewed thus far and used as a basis for my opinions.

**Riverside County Sheriff's Office, Officer-Involved Shooting/Fatal, 2/5/23, R.S.O. Case No. MB230360001, SBSD Case No. 6023000111, (Non-Party RSD 440-441).**

*"On 2/5/23, at 1012 hours, San Bernardino County Deputy Sheriff Abernathy and Kridner were dispatched to a trailer on fire call in the area of Indio Avenue and Canterbury Street in the unincorporated area of San Bernardino County known as Yucca Valley."*

*"Upon arrival in separate vehicle, Deputy Abernathy and Kridner tried to make contact with a male subject, later identified as Antonio Garza, who was sitting inside a truck at the location. Deputy Abernathy and Kridner observed the fire and tried to make contact with Garza."*

*"Garza started the truck and drove from the area, crashing through a fence in the process. Deputy Abernathy and Kridner got back in their own vehicles and began pursuing Garza. Deputy Abernathy and Kridner turned their lights and sirens on, and Garza refused to pull over. The pursuit went westbound from the property, the first main road which was State Highway 247. From there it went southbound 247, to westbound*

*State Highway 62, to westbound Interstate 10. Garza stopped when he drove his truck off the side of Interstate 10, just east of the Whitewater exit at 1055 hours. According to the radio traffic and SBSO CAD report, Garza drove recklessly during the highspeed pursuit which got up to 80 MPH. During the pursuit, Garza crossed into oncoming traffic, drove onto the dirt shoulder and failed to stop at red lights."*

*"After Garza drove his truck off of the freeway, he exited the truck holding a golf club, (pitching wedge). Garza fled on foot into the sandy desert area north of the freeway with Deputy Abernathy and Kridner chasing him on foot. SBSO Deputy Camacho and CHP Officer Cornejo arrived on scene at this time also began chasing Garza on foot. Deputy Camacho was armed with a less lethal shotgun."*

*"Garza is heard on an audio-recording carried by Deputy Abernathy telling the Deputies to leave him alone and that he didn't want to go back to jail. The sound of running can be heard on the recording. The foot pursuit lasted approximately one minute and twenty-two seconds until the sound of Deputy Camacho firing the less lethal shotgun is heard. Approximately 14 seconds later, a series of 14 gunshots is heard. Approximately 11 seconds later, a second series of 7 gunshots is heard. The information of shots fired was broadcasted over the police radio at 1057 hours."*

*"Garza fell to the ground and deputies handcuffed him and provided medical aid including CPR. Medics arrived at 1120 hours and took over life-saving efforts. They pronounced Garza deceased at 1124 hours."*

*"San Bernardino County Sheriff's Sergeant Stafford stated that a San Bernardino County Sheriff Arson Investigator was sent to the scene of the fire, and it was his belief that the Deputies were chasing Garza due to his possible involvement in an arson."*

*"Investigator Magana and Deputy Coroner Montez processed Garza's body at the scene, and it appeared he had defects to the front of his body presumed to be gunshots in the following areas: neck, chest (2), left arm, lower left thigh."*

## Opinions:

Note: None of my opinions are intended to usurp the province of the jury and are not stated as ultimate issues. I hold the opinions below a reasonable degree of professional certainty. The basis and reasons for my opinions are premised upon my education, training and experience in law enforcement, my knowledge of law enforcement standards, analysis and study; my familiarity with generally accepted police practices and the professional and academic literature in the field; my review of relevant actions, policies and procedures; and my understanding of the facts of this case based on my comprehensive materials listed on Pages 2-5 of this report. My opinions and testimony regarding police procedure are relevant topics concerning issues of which lay jurors are unaware or frequently have misconceptions. My testimony on these topics is relevant and would assist a jury in understanding the evidence presented to them.

### Opinion Number 1

It is my opinion based on my review of the facts and testimony in this matter, a reasonable Deputy Sheriff would have initially determined Mr. Antonio F. Garza Jr., was mentally ill or experiencing a mental crisis. It is my opinion San Bernardino County Sheriff's Department Deputy Sheriffs Bill Abernathy and Nicholas Kridner, failed to initially determine Mr. Antonio F. Garza Jr. was mentally ill or experiencing a mental crisis.

Throughout the United States and in California, law enforcement agencies have recognized and trained their officers in multiple ways to safely interact with subjects such as Mr. Antonio F. Garza Jr., who are suffering from a mental illness or experiencing a mental crisis. The objective is to avoid unnecessary injury and or death. The underlying principle is reverence for human life. These correct and reasonable methods are recognizing cues and other indicators in order to make appropriate decisions regarding intervention strategies; time to assess the situation; calm the situation; request additional resources and equipment; provide reassurance that the Deputies officers are there to help; give the person time to calm down; move slowly; eliminate emergency lights and reduce environmental distractions. These correct and reasonable methods are well known and proven effective for the safety and welfare of both Peace Officers and the public.

In addition, law enforcement officers are taught that they should attempt to de-escalate and utilize proper defusing techniques throughout an incident. There was no rush. Mr. Antonio F. Garza Jr. was in a desolate area and there were not any civilians or residences in the immediate area. There was no crime in progress.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 20-Chapter 2: Force Options, Communication, 2-11: Effective communication may enable a peace officer to gain cooperation and voluntary compliance in stressful situations.

The vast majority of law enforcement responsibilities involve effective communication. Communication involves both command presence and words resulting in improved safety. Effective communication can:

- Provides skills that reduce the likelihood of physical confrontation.
- Can result in a reduction of injuries.
- Renders more effective public service and improves community relations.
- Decreases public complaints and internal affairs investigations.
- Decreases civil liability.
- Lessens personal and professional stress.

In addition, when reasonable, officers should evaluate the totality of the circumstances presented at the time in each situation and, when feasible, consider and utilize reasonably available alternative tactics and techniques that may persuade an individual to voluntarily comply or may mitigate the need to use a higher level of force to resolve the situation before applying force, (Government Code 7286(b)(1)). Such alternatives may include but are not limited to:

(a). Attempts to de-escalate a situation.

(b). If reasonably available, the use of crisis intervention techniques by properly trained personnel.

In addition, the Defendants Deputies failed to comply with SBSD Policy 3.606.10-De-Escalation, (Garza-SBD-009435): It is necessary for members to utilize crisis intervention tactics when applicable to a situation. If a member, based on their training and experience, determines a subject that might be experiencing a crisis, the member shall consider crisis intervention tactics as an available means of de-escalation.
In addition, I base my opinion on the following facts and testimony:

- According to Deputy Joela Jimenez the San Bernardino County Sheriff's Department does not have a system to provide mental health information in real time to Deputies in the field so they may accommodate an individuals' mental health disability, (Deposition Transcript of Joela Jimenez, Pages 35-46).

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 2

It is my opinion based on my review of the facts, testimony, and the totality of the circumstances in this matter, a reasonable law enforcement officer acting consistent with standard police practices would have remained in a position of cover and established a perimeter and formulated an effective and safe tactical plan at the termination of the pursuit when Mr. Antonio F. Garza Jr. fled on foot from his vehicle. It is my opinion based on my review of the facts, testimony and videos in this matter, San Bernardino County Sheriff's Department Deputy Sheriffs Bill Abernathy and Nicholas Kridner should have stayed at a position of cover or immediately moved to a position of cover and waited for additional San Bernardino County Sheriff's Department Deputy Sheriffs, Riverside County Sheriff's Department Deputy Sheriffs and California Highway Police Officers and San Bernardino County Sheriff's Department Police Helicopter (40 King) who was enroute to the call to assist with containment and tactical deployment to take Mr. Antonio F. Garza Jr. into custody.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-8):

**First Unit at the Scene:** The first unit to arrive at the scene should take on the role of the primary unit. That officer should take the leadership responsibility to gather as much information as is reasonably possible regarding the current status of the crime scene. It is the primary officer who must take charge and initiate the appropriate steps toward controlling the situation.

The first officer to arrive should:

- Take a position to best observe and control the scene.
- Advise dispatch and responding units of the arrival and location.
- Identification and location of reporting person.
- Interview of reporting person to determine if a crime occurred.
- Number of suspects and suspect(s) description.
- The type of weapon(s) involved.
- The number of persons injured by the suspect.
- Actions (propensity toward violence).
- Suspects current and prior mental health issues.
- Suspects current and prior medical issues.
- Other emergency vehicles responding to the scene.
- ***Communicate and coordinate with the other officers to establish perimeters to contain the suspect and prevent escape.***
- ***Request additional resources if necessary and available, (e.g., supervisor, additional units and canine unit).***

The Aviation Unit is one of the most technologically advanced and efficient law enforcement tools. The aircraft and their equipment are a "force multiplier" for law enforcement. One helicopter in the air can cover as much territory (more quickly) as 12 officers in patrol cars on the ground. The primary function continues to be that of support for ground units.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23, Chapter 2: Basic Tactical Considerations Approach, (2-10):

**Establishment of a Perimeter:**

It is the responsibility of the primary officer to initiate the coordination of the security and containment of the crime scene. This can be done by establishing a boundary or perimeter completely surrounding the area involved.

The establishment of a secure perimeter may be essential to safely resolve the crime in progress.

Establishing a perimeter:

- Contains and isolates the crime scene.

- Prevents the suspect(s) from escaping the area.
- It prevents unauthorized entry into the area.
- Can aid in apprehending the suspect(s).

There are two types of perimeters at a crime scene: **inner perimeter** and **outer perimeter**:

**Inner Perimeter**:

- Immediate area around the incident (e.g., private residence, commercial establishment, vehicle, etc.)
- Varying size depending on the purpose of the perimeter.

**Outer Perimeter:**

- Area surrounding the inner perimeter.
- May aid in apprehension if the suspect manages to breech the inner perimeter.

In addition, I base my opinion on my twenty-eight years of law enforcement experience as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of perimeters throughout all geographical patrol divisions to assist with containment, perimeter tactics and K9 searches. In addition, most of the K9 searches involved the assistance of an Air Unit(s).

The tactical plan should have outlined verbal skills (defusing and de-escalation techniques) and Less Lethal Force options such as: empty hands, physical strength and compliance techniques, soft or hard hand techniques, the X-26 Conducted Energy Weapon, (CEW), Taser with an effective range of 7-15 feet and maximum range of 21-25 feet, Ballistic Shield, K9, Pepper Ball Round, 40MM Foam Baton Round and or Direct Impact CS Round, ASP/ baton, Oleoresin Capsicum "OC" spray with an effective range of 10-15 feet., or the deployment of the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round. The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blended and filled with #9 shot. The design utilizes four stabilizing tails and smokeless powder as the propellant. The round has a velocity of 270 feet per second (FPS) with a maximum effective range of 75 feet which could have effectively been deployed from a position of cover. In addition, it is my opinion the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round, can be deployed multiple times in the event the Deputy misses the intended target, or multiple deployments are necessary to overcome the subject's resistance.

The Taser is a Conducted Energy Weapon, (CEW), as defined by the manufacturer, Axon. It is a handheld, battery operated tool which uses controlled electrical current designed to disrupt a person's sensory and motor nervous system by means of deploying electrical energy sufficient to cause temporary uncontrolled muscle contractions, or Neuro Muscular Incapacitation, ("NMI"). As a result, the electrical energy can override the person's voluntary motor responses for a brief duration. The use of Taser CEW deployment resulting in NMI may provide a brief opportunity during which physical restraint procedures can be initiated whenever practical.

In addition, I base my opinion on POST Learning Domain 21, "Officers must approach every contact with officer safety in mind. Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack."

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 22, Chapter 3: High Risk Vehicle Pullovers:

**Officer's Reactions:**

- Work as a team,
- Maintain communications with dispatch and other involved officers,
- Move slowly and methodically,
- Rely on known tactics and procedures while also remaining flexible enough to adapt or improvise if necessary, and
- Exercise emotional restraint and self-control.

**Safety Precautions:**

- Request sufficient personnel and equipment to perform any necessary actions safely and effectively and achieve a psychological advantage over the vehicle's occupant(s).
- Use available cover and concealment.
- Always maintain a position of advantage.
- Do not rush.
- Guard against being impatient (Time is usually on the officer's side).
- Wait for requested backup/assistance to arrive before taking action.

A number of safety precautions are critical when conducting a high-risk vehicle pullover:

**Utilize Appropriate Resources/Equipment:**

- Request sufficient personnel and equipment to perform any necessary action safely and effectively and achieve a psychological advantage over the vehicle's occupants.

- Use marked patrol vehicles to affect the vehicle pullover, if possible, to prevent recognition problems and ensure necessary equipment is available within the vehicle.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 2: Basic Tactical Considerations, Tactical Approach: Peace officers should always be aware of surrounding objects or areas that may be utilized for cover or concealment.

**Cover**:

- Anything that may stop or deflect an opponent's bullets.
- Should be used when involved in an armed encounter if possible.
- The type of cover will depend on the type of firearm received (firearm, shotgun, rifle).

**Examples of Cover:**

- Cement block or brick walls.
- Buildings.
- Portion of the vehicle with the engine block.
- Trees.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 23-Crimes in Progress, Chapter 3: Responding to Specific Crimes in Progress, 3-5:

**Establish a Contact Officer and Cover Officers:**

**Contact Officer:**

The roles and responsibilities of each officer involved in a high-risk vehicle pullover must be clear. The **Contact Officer:**

- Conducts the business of the pullover,
- Directs the driver and occupants(s) of the target vehicle,
- Takes necessary actions related to the investigation.

**Cover Officers:**

It is general responsibility of any cover officers to assist the primary officer at the scene of a high-risk vehicle pullover to:

- Protect the primary officer who is conducting the business of the pullover,
- Take and maintain proper positions of cover and concealment,

- Maintain their firearms at the ready, and
- Maintain visual contact with the vehicle occupant(s) at all times,
- Avoid a crossfire situation.

**Communications Between Officers:**
In order to ensure officer safety and help ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another. Appropriate communication involves:

- Advising the primary officer of any critical occurrences or safety issues,
- Avoid inappropriate interruptions and,
- Avoid giving directions which conflict with those given by the primary officer.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I have been involved in vehicle pursuits and vehicle pullovers as Primary Officer, Secondary Officer and a Supervisor. In addition, I have received and provided training on Pursuit Policy, Pursuit Tactics, Post-Pursuit Tactics and Containment. In addition, I have conducted over (50) Vehicle Pursuit Investigations during my last 14 years as a Supervisor with the Los Angeles Police Department. In addition, as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon, I responded to hundreds of Vehicle Pursuits throughout all geographical patrol divisions to assist with containment, perimeter tactics and ultimately K9 searches.

Lastly, I base my opinion on my twenty- eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 3

It is my opinion, based on my review of the videos, facts and testimony, San Bernardino County Sheriff's Department Deputy Sheriffs Bill Abernathy and Nicholas Kridner, failed to formulate a safe tactical plan and failed to discuss and implement reasonable tactical contingencies in the event Mr. Antonio F. Garza Jr. did not comply with verbal commands and how Mr. Antonio F. Garza Jr. may respond in the event a Less Lethal Force Option such as the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round strikes him. The Drag Stabilized 12-Gauge Round is a translucent 12 Gauge shell loaded with a 40-Gram tear shaped bag made from a cotton and ballistic material blended and filled with #9 shot. The design utilizes four stabilizing tails and smokeless powder as the propellant. The round has a velocity of 270 feet per

second (FPS) with a maximum effective range of 75 feet which could have effectively been deployed from a position of cover.

This is a direct fire deployment, and the Deputy Sheriff should be adequately trained in the use of Less Lethal Impact Munitions and have a thorough understanding of the round and considerations for selecting shot placement such as level of threat, target distance, size and clothing. In addition, a properly trained Deputy Sheriff in the deployment of a Drag Stabilized 12-Gauge Bean Bag Round would know that a common response to the pain associated with being struck with a single Drag Stabilized 12-Gauge Bean Bag Round or multiple Drag Stabilized 12-Gauge Bean Bag Rounds may cause the subject to run to avoid the pain associated with being struck with the projectile(s) or additional projectiles. In addition, it is my opinion the 870 Remington 12-Gauge Shotgun with a Drag Stabilized 12-Gauge Bean Bag Round, can be deployed multiple times in the event the Deputy misses the intended target, or multiple deployments are necessary to overcome the subject's resistance.

In addition, I base my opinion as a former Long Range Impact Device Instructor, (40MM/37MM/Remington 870 Bean Bag Shotgun), during my tenure as a Los Angeles Police Department Sergeant II+1 at Metropolitan Division K9 Platoon and as a Sergeant II+1 assigned to Metropolitan Division Special Weapons and Tactics, (SWAT).

There was not a crime in progress. There was no rush. Deputy Sheriffs are taught, or should be taught, Time and Distance.

In addition, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol, 1-21:

**Inappropriate Attitude:**

- Careless or complacent.
- Overconfident.
- Too aggressive.

**Poor or No Planning:**

- Rushing into the situation without any plan of action.
- Failure to establish plan of action prior to engaging the suspect.
- Not considering alternative actions.

As set forth in POST Learning Domain 22, "Officers are trained to work together and function as a team. In order to ensure officer safety and to ensure an appropriate outcome, the primary officers and cover officers must effectively communicate with one another. Appropriate communication involves advising the primary officer of any critical occurrences or safety issues."

In addition, I base my opinion on California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 21-Chapter 1: Basic Concepts of Law Enforcement Patrol,1-22: The element of officer safety refers to the practical application of tactically sound procedures to perform law enforcement activities in a safe and effective manner to include the utilization of available resources. Some of the available resources in this situation can include calling for backup officers, waiting for and deploying backup officers; remaining in a position of advantage, cover, and concealment; issuing commands and verbalization from a position of cover; using less-than-lethal and other tactics that officers are trained to use in these situations.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Opinion Number 4**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Antonio F. Garza Jr. that he was going to fire his service weapon. The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible…*" Based upon my review of the facts in this matter, San

Bernardino County Sheriff's Department Deputy Sheriff Bill Abernathy did not give a verbal warning to Mr. Antonio F. Garza Jr. and give Mr. Antonio F. Garza Jr. a reasonable opportunity to comply prior to firing two volleys of gunfire from Glock Model 17, 9MM semi-automatic pistol killing Mr. Antonio F. Garza Jr.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Opinion Number 5**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices and outlined in the California Commission on Peace Officers Standards and Training, Student Materials, Learning Domain, No. 20, Use of Force, Version 3.3, Pages 3-4, would have given a verbal warning to Mr. Antonio F. Garza Jr. that he was going to fire his service weapon. The Supreme Court applied the reasonableness test set forth in the Fourth Amendment (Tennessee v. Garner), "*some warning be given prior to the use of deadly force where feasible…*" Based upon my review of the facts in this matter, San Bernardino County Sheriff's Department Deputy Sheriff Nicholas Kridner did not give a verbal warning to Mr. Antonio F. Garza Jr. and give Mr. Antonio F. Garza Jr. a reasonable opportunity to comply prior to firing two volleys of gunfire from Glock Model 21, .45 caliber semi-automatic pistol killing Mr. Antonio F. Garza Jr.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 6

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices would not have used lethal force in this situation. It is my opinion based on my review of the facts and testimony in this matter, Mr. Antonio Garza Jr. was not an imminent or immediate lethal threat at the time that San Bernardino County Sheriff's Department Deputy Sheriff Nicholas Kridner fired two volleys of gunfire from Glock Model 21, .45 caliber semi-automatic pistol killing Mr. Antonio F. Garza Jr.

Imminent means: a threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)).

Fear alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm but is one that from appearances must be instantly confronted and addressed. (Penal Code Section 835a).

## Considerations Regarding the Use of Deadly Force

The use of deadly force is the most serious decision a peace officer may ever have to make. Such a decision should be guided by ***the reverence for human life*** and used only when other means of control are unreasonable or have been exhausted. Reverence for life is the foundation on which deadly force rests. Deadly force is always the last resort used in the direst of circumstances. The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are

expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.
Officers are trained at the POST Basic academy, and the use of force must meet an "*Objectively Reasonable"* standard. The following quote from POST typifies the training (emphasis added):*"A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."(Learning Domain #20; "Introduction to the Use of Force, " pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.* This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer* "*police powers*" *on themselves*. These powers come to the criminal justice system from the people they serve. (Learning Domain #2: "Criminal Justice System," Pages 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard. In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear. The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actual perceived circumstances.* POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added). Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

In addition, it is my opinion that Deputy Sheriff Nicholas Kridner violated San Bernardino County Sheriff's Department Policy 3.6.08, The Use of Lethal Force:

The use of lethal force is justified in the following circumstances:

- A safety member may use lethal force to protect himself or others from what he reasonably believes to be an immediate threat of death or serious bodily injury, (**Does not apply to the facts in this matter**).
- A safety member may us lethal force to accomplish the arrest or prevent escape of a suspected felon, when the member has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to the deputy or others, **(Does not apply to the facts in this matter)**.

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Opinion Number 7**

It is my opinion that a reasonable Deputy Sheriff acting consistent with standard police practices would not have used lethal force in this situation. It is my opinion based on my review of the facts and testimony in this matter, Mr. Antonio Garza Jr. was not an imminent or immediate lethal threat at the time that San Bernardino County Sheriff's Department Deputy Sheriff Bill Abernathy fired two volleys of gunfire from Glock Model 17, 9MM semi-automatic pistol killing Mr. Antonio F. Garza Jr.

Imminent means: a threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)).

Fear alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm but is one that from appearances must be instantly confronted and addressed. (Penal Code Section 835a).

**Considerations Regarding the Use of Deadly Force**

The use of deadly force is the most serious decision a peace officer may ever have to make. Such a decision should be guided by ***the reverence for human life*** and used only when other means of control are unreasonable or have been exhausted. Reverence for life is the foundation on which deadly force rests. Deadly force is always the last resort used in the direst of circumstances. The authority to use deadly force is an awesome responsibility given to police officers by the people who expect them to exercise that authority judiciously. In the law enforcement/community partnership, peace officers are expected to be self-disciplined, accountable, and in turn, the community is expected to support its peace officers.

Officers are trained at the POST Basic academy, and the use of force must meet an "*Objectively Reasonable*" standard. The following quote from POST typifies the training (emphasis added):"*A reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."(Learning Domain #20; "Introduction to the Use of Force, " Pages 1-4).

Further, POST teaches in the basic curriculum regarding the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:"
1. The power of arrest and
2. The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator. Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost care and restraint.* This is why it is important to emphasize that peace officers do with the utmost care and restraint, *not confer* "*police powers*" *on themselves*. These powers come to the criminal justice system from the people they serve. (Learning Domain #2: "Criminal Justice System," Pages 1-4, Emphasis added).

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."

**"Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate." Also, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of the circumstances." (Learning Domain #20 "Use of Force," Chapter 2).

POST training specifies that the use of force under the "totality of the circumstances" be only justified on the basis of an "objectively reasonable" standard. In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear. The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *A controlled and legitimate fear or mechanism that is necessary for officer safety based on actual perceived circumstances.* POST defines "Unreasonable Fear" as: *Generated in the officer's mind with no direct correlation to facts and situations.* (Learning Domain #20, Chapter 5, Emphasis added). Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective" "reasonable necessity" of action to "imminent danger." (Learning Domain #20, Chapter 3).

A great deal of emphasis is placed on tried and proved tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death.

In addition, it is my opinion that Deputy Sheriff Bill Abernathy violated San Bernardino County Sheriff's Department Policy 3.6.08, The Use of Lethal Force:

The use of lethal force is justified in the following circumstances:

- A safety member may use lethal force to protect himself or others from what he reasonably believes to be an immediate threat of death or serious bodily injury, (**Does not apply to the facts in this matter**).
- A safety member may us lethal force to accomplish the arrest or prevent escape of a suspected felon, when the member has probable cause to believe that the suspect poses a significant threat of death or serious bodily injury to the deputy or others, **(Does not apply to the facts in this matter).**

In addition, I base my opinion on my twenty-eight years of law enforcement experience where I responded to thousands of calls for service and have effectively utilized defusing techniques, de-escalation techniques, verbal strategies, and active listening skills to reduce the potential for violence and bring the emotional level of the incident to a manageable level.

In addition, I base my opinion on my twenty-eight-year law enforcement career and specifically during my assignment as a Sergeant II+1 at Los Angeles Police Department Special Weapons and Tactics (SWAT) where I supervised hundreds of SWAT incidents that involved the use of the SWAT's Crisis Negotiation Team.

Lastly, I base my opinion on my twenty-eight-year law enforcement career where, as a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 8

It is my opinion that there was a gross lack of "situational awareness" and fundamental tactical errors in this incident. It is also my opinion that there was a failure by the San Bernardino County Sheriff's Department to properly train the Defendant Officers on following subject matters: Proper Response and Interaction with the Mentally Ill, Working as a Team, Verbal Strategies, Active Listening Skills, Crisis Intervention Training, Defusing and De-Escalation Techniques, Tactical Plan, Command and Control,

Use of Cover and Contact Officers, Use of Cover and Concealment, Situational Awareness, the use of Less Lethal Force and the use of Lethal/Deadly Force.

It is my opinion the San Bernardino County Sheriff's Department failed to determine through their investigation and review process that there was a failure to effectively de-escalate the situation and that the Lethal Force used in this matter was inappropriate, unnecessary, and unreasonable, based on the totality of the circumstances.

It is also my opinion that there was a departure of POST Standards, Use of Force and Use of Deadly Force Training. In addition, I base my opinion on the California Supreme Court opinion in Hayes v. County of San Diego, 2013 Cal LEXIS 6652. In Hayes, the California Supreme Court found that, under California negligence law, an officer's pre-shooting conduct leading up to a deadly use of force may affect whether a use of force is ultimately reasonable and therefore may be considered in the analysis of any use of deadly force.

In addition, the Defendants Lethal Force Encounter (LFE) Review Board failed to consider all relevant evidence available to consider to make an appropriate determination of the reasonableness of the Deputies actions to include the use of lethal force. In addition, the San Bernardino County Sheriff's Department ratified, endorsed and perpetuated the conduct of San Bernardino County Sheriff's Department Deputy Sheriffs Bill Abernathy and Nicholas Kridner, by determining their conduct was within policy and for failing to properly train and discipline them to include termination. These types of decisions tend to have a ripple effect in the Department because other Deputies believe that they can engage in similar conduct without consequences.

In addition, it is my opinion the San Bernardino County Sheriff's Department failed properly report that Mr. Antonio F. Garza Jr. had (11) gunshot wounds and not (5) gunshot wounds. In addition, there was a failure by the SBSD to properly investigate this matter to include rectifying numerous inconsistencies and not considering all evidence to include cell phone footage of the incident that was captured by a witness.
In addition, if to believe the Defendants version of the events regarding distancing the use of Oleoresin Capsicum Spray and the Taser Conducted Electrical Weapon would have been reasonable Less Lethal Force options if Mr. Garza failed to comply and threatened the involved Law Enforcement Officers with the golf club.

In addition, I base my opinion on the following facts and testimony:

- According to Deputy Alexander Camacho, he aimed at Mr. Garza's chest with the bean bag, and he believes it hit him, (Deposition Transcript of Alexander Camacho, Page 85).
- According to Deputy Alexander Camacho, he did not ever see Mr. Garza swinging the golf club, (Deposition Transcript of Alexander Camacho, Pages 95-96).
- According to Deputy Alexander Camacho, he fired the bean bag gun from 30-50 yards away, (Deposition Transcript of Alexander Camacho, Page 98).
- According to Deputy Alexander Camacho, they never formulated a tactical plan and there was no attempt to set up a perimeter, (Deposition Transcript of Alexander Camacho, Page 102).
- According to Deputy Alexander Camacho, the CHP Officer within 10 feet of Mr. Garza and nobody told him to back up, (Deposition Transcript of Alexander Camacho, Page 105).
- According to Deputy Alexander Camacho, he does not remember Deputy Abernathy giving any commands to Mr. Garza, (Deposition Transcript of Alexander Camacho, Page 111).
- According to Deputy Alexander Camacho, he was aware the Air-Unit was on its way, (Deposition Transcript of Alexander Camacho, Page 116).
- According to Deputy Alexander Camacho, he never heard Deputy Abernathy or Deputy Kidner call for a backup, (Deposition Transcript of Alexander Camacho, Pages 117-118).
- According to Deputy Alexander Camacho, he believes Mr. Garza say, "kill me," or something like that, (Deposition Transcript of Alexander Camacho, Page 123).
- According to Deputy Alexander Camacho, he wanted to get Less Lethal because Mr. Garza might be experiencing a mental crisis, (Deposition Transcript of Alexander Camacho, Page 128).
- According to CHP Officer Moises Cornejo, he did not communicate anything to the Deputies that he was going to approach Mr. Garza, (Deposition Transcript of Moises Cornejo, Page 69).
- According to CHP Officer Moises Cornejo, he never saw Mr. Garza attempt to stand up after being shot, (Deposition Transcript of Moises Cornejo, Page 74).
- According to CHP Officer Moises Cornejo, he stepped back approximately 1-2 feet and then he heard 8-10 gunshots from the Deputies who were standing more than a car lengths away, (Deposition Transcript of Moises Cornejo, Page 74).
- According to CHP Officer Moises Cornejo, prior to the second volley of shots, he didn't hear anything at all, (Deposition Transcript of Moises Cornejo, Pages 75-76).

- According to CHP Officer Moises Cornejo, he was concerned that he could have been hit by bullets, (Deposition Transcript of Moises Cornejo, Page 76).
- According to CHP Officer Moises Cornejo, he again yelled multiple times for the Deputies to stop shooting during the second volley of shots, (Deposition Transcript of Moises Cornejo, Page 76).
- According to CHP Officer Moises Cornejo, when Mr. Garza swung the club, he swung it in front of his body, possibly a couple of inches, (Deposition Transcript of Moises Cornejo, Page 112).
- According to CHP Officer Moises Cornejo, prior to the first round of shots he never saw Mr. Garza swing the golf club at him or a Deputy. Garza swung it more to get us to back off or to create distance, (Deposition Transcript of Moises Cornejo, Page 112).
- According to CHP Officer Moises Cornejo, he went to Joshua Tree that day and sat down with everybody that was involved in the incident with Mr. Garza, (Deposition Transcript of Moises Cornejo, Page 117).
- According to CHP Officer Moises Cornejo, he was never interviewed by RSO CHP or SBSD regarding this incident, (Deposition Transcript of Moises Cornejo, Pages 118-119).
- According to Captain Robert Warrick, there was no discipline handed down and there were no policy violations noted, (Deposition Transcript of Captain Robert Warrick, Page 51).
- According to Deputy Bill Abernathy, he believes the effective range of the Remington 870 Bean Bag Shotgun is 20 feet, (Deposition Transcript of Deputy Bill Abernathy, Page 52).
- According to Deputy Bill Abernathy, he believes the effective range of the Taser is 7-10 feet and the effective range of OC spray is 5 feet, (Deposition Transcript of Deputy Bill Abernathy, Page 52).
- According to Deputy Bill Abernathy, he was told that he did no policy violations regarding this incident, (Deposition Transcript of Deputy Bill Abernathy, Page 72).
- According to Deputy Bill Abernathy, he had a Taser, OC spray, a Baton and a Bean Bag Shotgun in the trunk of his vehicle, (Deposition Transcript of Deputy Bill Abernathy, Page 87).
- According to Deputy Bill Abernathy, at no point did he or the other Officers back up to give Mr. Garza more space, (Deposition Transcript of Deputy Bill Abernathy, Page 121).

- According to Deputy Bill Abernathy, he can't recall if he gave orders or commands to Mr. Garza before the 2nd volley of shots, (Deposition Transcript of Deputy Bill Abernathy, Page 146).
- According to Deputy Bill Abernathy, he heard Mr. Garza say, "just shoot me," (Deposition Transcript of Deputy Bill Abernathy, Page 52).
- According to Deputy Bill Abernathy, he didn't develop a plan with Deputy Kridner, (Deposition Transcript of Deputy Bill Abernathy, Page 152).
- According to Deputy Bill Abernathy, he left his baton in his car, (Deposition Transcript of Deputy Bill Abernathy, Page 181).
- According to Deputy Nicholas Kridner, he believes the effective range of the Bean Bag shotgun is 20-25 feet, (Deposition Transcript of Nicholas Kridner, Pages 40-41).
- According to Deputy Nicholas Kridner, SBSD has a K9, (Deposition Transcript of Nicholas Kridner, Page 53).
- According to Deputy Nicholas Kridner, he did not see any people in the area of Mr. Garza, (Deposition Transcript of Nicholas Kridner, Page 123).
- According to Deputy Nicholas Kridner, he remembers Mr. Garza saying, "just shoot me," multiple times, (Deposition Transcript of Nicholas Kridner, Page 127).
- According to Deputy Nicholas Kridner, he does not know how far Mr. Garza was from him when he started firing, (Deposition Transcript of Nicholas Kridner, Page 192).
- According to Assistant Sheriff Samuel Fisk, the only video footage that the Homicide Detail received was only the Dash Camera, (Deposition Transcript of Samuel Fisk, Page 87).
- According to Assistant Sheriff Samuel Fisk, he does not know if the Homicide Detail reviewed any of cell phone video footage of the shooting, (Deposition Transcript of Samuel Fisk, Pages 87-88).
- According to Assistant Sheriff Samuel Fisk, there was no cell phone video footage of the of the shooting shown at the LFE Review Board, (Deposition Transcript of Samuel Fisk, Page 88).
- According to Assistant Sheriff Samuel Fisk, he does not know if the Homicide Detail took any steps to verify the information that Mr. Garza swung a golf club towards Deputy Nicholas Kridner, (Deposition Transcript of Samuel Fisk, Page 88).
- According to Assistant Sheriff Samuel Fisk, he does not know how it was ascertained that Mr. Garza attempted to strike Officer Cornejo with the golf club, (Deposition Transcript of Samuel Fisk, Page 89).

- According to Assistant Sheriff Samuel Fisk, he was unaware that Mr. Garza had (11) gunshot wounds, (Deposition Transcript of Samuel Fisk, Pages 91-92).
- According to Assistant Sheriff Samuel Fisk, he does not recall if Mr. Garza was shot in the back, (Deposition Transcript of Samuel Fisk, Page 93).
- According to Assistant Sheriff Samuel Fisk, they did not conduct an internal investigation, (Deposition Transcript of Samuel Fisk, Page 113).
- According to Assistant Sheriff Samuel Fisk, he believes that all information would be helpful at the LFE Review Board, (Deposition Transcript of Samuel Fisk, Page 127).
- According to Assistant Sheriff Samuel Fisk, there were no plans to reopen the LFE Review Process to review the bystander cell phone video footage, (Deposition Transcript of Samuel Fisk, Page 127).
- According to Assistant Sheriff Samuel Fisk, the LFE Review Board, there were no violations of policies, (Deposition Transcript of Samuel Fisk, Page 131).
- According to Deputy Nicholas Kridner he was previously disqualified in the background process for the position of Deputy Sheriff with the San Bernardino County Sheriff's Department, (Deposition Transcript of Nicholas Kridner, Page 218).
- According to Sergeant Michael Warrick, he does not recall any cell phone video footage in this case and if he had it, he would have included it at the LFE Review Board, (Deposition Transcript of Michael Warrick, Page 36)

Lastly, I base my opinion on my twenty- eight- year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

## Opinion Number 9

It is my opinion San Bernardino County Sheriff's Department Deputy Sheriffs Bill Abernathy and Nicholas Kridner's use of lethal force violated Peace Officer Standards and Training and caused the unnecessary death of Mr. Antonio F. Garza Jr., including but not limited to for the following reasons:

- Deputy Sheriffs are trained that deadly force is the highest level of force a Deputy Sheriff can use.
- This was not an immediate Defense of Life situation.
- Deputy Sheriffs are trained that deadly force can only be used as a last resort.

- Deputy Sheriffs are trained that deadly force can only be used in the direst of circumstances.
- Deputy Sheriffs are trained that deadly force is likely to cause great bodily injury or death.
- Deputy Sheriffs are trained that they must show a reverence for human life.
- There were other reasonable measures available.
- All other reasonable measures were not exhausted.
- A verbal warning should be given, when feasible, that deadly force will be used. Here, no warning was given, even though it would have been feasible to do so.
- Deputy Sheriffs are trained that they are responsible for justifying every shot.
- Subjective Fear is insufficient to justify using deadly force.
- Deputy Sheriffs are trained that an overreaction in using deadly force is excessive force.

I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over 100 Use of Force Incidents as well as being personally involved in the use of lethal and less than lethal force incidents.

**Supplemental Opinion Number 1**

It is my opinion based on my review of the facts in this matter; the San Bernardino County Sheriff's Department should not have hired applicant Mr. Bill Abernathy due to integrity reasons during the on-line testing process. Based on my review of the facts in this matter, San Bernardino County Undersheriff Bill Abernathy provided assistance to his son applicant Mr. Bill Abernathy with at least (7) questions while he was taking the on-line examination at his residence. In addition, applicant Mr. Bill Abernathy initially checked the box "No" on Page 3 of the Pre-Job, Pre-Polygraph Questionnaire, (ABERNATHY 000193), but changed his response to "Yes" and stated, "Father gave me advice on 7 questions."

In addition, during my tenure with the Los Angeles Police Department Supervisor, I was an Interview Board Member for over 100 police applicant interviews. If an applicant either admitted or was caught cheating during the application process, the applicant would be permanently disqualified from employment with the Los Angeles Police Department due to integrity and truthfulness issues.

In addition, it is my opinion, if San Bernardino County Undersheriff Bill Abernathy provided assistance to his son Mr. Bill Abernathy, (if he was an active member of SBSD), with any questions on a San Bernardino County Sheriff's Department paygrade

advancement and or civil service examination, an Internal Affairs Division Investigation would be generated that would or should likely result in their termination.

In addition, to my education and experience, I base my opinion, California Police Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2, Professionalism and Ethics in Policing that states, "The Law Enforcement Code of Ethics was adopted as a uniform code of ethics to guide the peace officer. By adhering to the code, officers demonstrate to the community and to their peers that they are honorable and trustworthy."

California Peace Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2-Professionalism and Ethics in Policing: The Code of Ethics of any profession details the standard of conduct that identifies specific principles of desired behavior required of its practitioners. The profession of policy requires its members to adhere to specific standards in order to maintain the trust and respect of those who are served. Adherence to a Code of Ethics is required to build and maintain morale, a sense of duty, effective standards of performance and community support. Peace Officers are held to higher standards then others in the community. Although policing shares ideals with other professions, only peace officers are given the authority and power to detain and arrest others and to deprive them of their liberty while awaiting adjudication of their offense. It is essential that officers understand the importance of professional behavior. To embody the spirit of professionalism, ethical conduct must be a way for those in policing. To maintain the community's trust, peace officers must maintain consistently high- standards of ethical conduct. Officers must model and live as examples of the behavior that they are charged to enforce. The policing community is only strong as its weakest link. Unethical conduct affects the image and morale of the entire profession, and it offends officers and society throughout the country.

In addition, to my education and experience, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2, Professionalism and Ethics in Policing that states, Unethical/unprofessional conduct, or breaches in ethical conduct can occur in any profession. The negative effects of such behavior are particularly detrimental to the policing profession. Any indiscretion severely damages the credibility of peace officers and their agencies and compromises public trust and support. Unethical/unprofessional conduct directly affects the officer in addition to affecting the image and effectiveness of law enforcement in the community.

Consequences to the officer range from mild to severe and may include the following:

- Disciplinary action up to and including termination.
- Civil and/or criminal liability (personal and agency).
- Embarrassment to stakeholders.
- Eroding the image of the profession.
- Reinforcement of negative stereotypes.
- Reduction of effectiveness.
- Diminishing public trust and cooperation.
- Compromising officer safety.

Lastly, In addition, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over (50) Personnel Complaints to include my assignment to Los Angeles Police Department Internal Affairs Group, Headquarters Section.

**Supplemental Opinion Number 2**

It is my opinion based on my review of the facts in this matter; the San Bernardino County Sheriff's Department should not have hired applicant Mr. Nicholas Kridner, and he should have been permanently disqualified for the following reasons:

- Kridner admitted he was untruthful with his background investigator in regard to an accident that he was involved in. Kridner admits to filing a false insurance claim to repair his parent's vehicle. Kridner violated California **Penal Code Section 550 which is a felony.**
- Kridner made a post-test admission that he has taken drinks and sandwiches from his employer; Starbuck's over his course of employment. The total sum of loss for the business was **$4800.00.** Kridner violated California **Penal Code Section 487 Grand Theft, ($4800.00 in the aggregate), which is a felony.**
- Kridner conducted unethical practices while an Explorer at the Yucaipa Station, (KRIDNER 005044).
- "While at a work party, they were using drugs," (KRIDNER 004776). Kridner stayed at the remainer of the party, (KRIDNER 004792).
- "I cheated on tests in high school," (KRIDNER 004792).
- "I drove under the influence of alcohol or drugs 3 times in the last five years," (KRIDNER 004923).
- "I have grabbed my girlfriend's arm out of anger," (KRIDNER 4931).

In addition, I agree with SBSD Deputy Sheriff G. Williams when he determined, "Based on the applicant intentionally lying during the background process, conducting unethical practices while an Explorer at the Yucaipa Station, and defending his actions instead of owning up to him immature choices he is being disqualified from the hiring process," (KRIDNER 005044).

In addition, it is my opinion, Starbucks Store Manager Nichole Jones would not have written Nicholas Kridner a recommendation and make the following statement, "I continue to be most impressed by Nicholas' integrity. He is honest, upstanding and forthright in all that he does," if she Ms. Jones knew that he continued to steal Starbuck's property over a period of time, (KRIDNER 004855). In addition, I am confident that if Nicholas Kridner, (if he was an active member of SBSD), stole $4800.00 from the SBSD, they would terminate his employment and file felony charges against him for California Penal Code Section 487 Grand Theft.

In addition, to my education and experience, I base my opinion, California Police Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2, Professionalism and Ethics in Policing that states, "The Law Enforcement Code of Ethics was adopted as a uniform code of ethics to guide the peace officer. By adhering to the code, officers demonstrate to the community and to their peers that they are honorable and trustworthy."

California Peace Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2-Professionalism and Ethics in Policing: The Code of Ethics of any profession details the standard of conduct that identifies specific principles of desired behavior required of its practitioners. The profession of policy requires its members to adhere to specific standards in order to maintain the trust and respect of those who are served. Adherence to a Code of Ethics is required to build and maintain morale, a sense of duty, effective standards of performance and community support. Peace Officers are held to higher standards then others in the community. Although policing shares ideals with other professions, only peace officers are given the authority and power to detain and arrest others and to deprive them of their liberty while awaiting adjudication of their offense. It is essential that officers understand the importance of professional behavior. To embody the spirit of professionalism, ethical conduct must be a way for those in policing. To maintain the community's trust, peace officers must maintain consistently high- standards of ethical conduct. Officers must model and live as examples of the behavior that they are charged to enforce. The policing community is only strong as its

weakest link. Unethical conduct affects the image and morale of the entire profession, and it offends officers and society throughout the country.

In addition, to my education and experience, I base my opinion on California Police Officer Standards and Training (POST), Learning Domain No. 1, Chapter 2, Professionalism and Ethics in Policing that states, Unethical/unprofessional conduct, or breaches in ethical conduct can occur in any profession. The negative effects of such behavior are particularly detrimental to the policing profession. Any indiscretion severely damages the credibility of peace officers and their agencies and compromises public trust and support. Unethical/unprofessional conduct directly affects the officer in addition to affecting the image and effectiveness of law enforcement in the community.

Consequences to the officer range from mild to severe and may include the following:

- Disciplinary action up to and including termination.
- Civil and/or criminal liability (personal and agency).
- Embarrassment to stakeholders.
- Eroding the image of the profession.
- Reinforcement of negative stereotypes.
- Reduction of effectiveness.
- Diminishing public trust and cooperation.
- Compromising officer safety.

Lastly, In addition, I base my opinion on my twenty-eight-year law enforcement career whereas a Supervisor, I have investigated over (50) Personnel Complaints to include my assignment to Los Angeles Police Department Internal Affairs Group, Headquarters Section.

**My Qualifications for Reviewing this Case:**

My opinions are based on my education, training, and experience. Upon my graduation in June 1988 from Northeastern University in Boston with a Bachelor's Degree in Criminal Justice, I was hired as Criminal Investigator/Special Agent, GS-1811. Upon completion of Criminal Investigator/Basic Agent School at the Federal Law Enforcement Training Center (FLETC), 6-Month academy, I was assigned to the Organized Crime Drug Task Force where I functioned as an agent and undercover operative. The investigations focused on targeting criminal organizations that were involved in large scale drug smuggling and money laundering operations.
I was assigned to the Office of the Special Agent In-Charge, in San Francisco from August 1988 until I joined the Los Angeles Police Department in November of 1989. While in the academy, I was selected by the staff to be my Recruit Class Leader. Upon my graduation from the LAPD Academy, I was assigned to 77th Division. In addition to being assigned to 77th Division, I was assigned to Northeast Division (Patrol), Northeast Division (Special Projects Unit-SPU), Northeast Division C.R.A.S.H (Gang Detail). I was selected to be transferred to Operations Central Bureau C.R.A.S.H., where I was assigned to a plain clothes detail targeting specific gangs throughout Operations Central Bureau.

I was selected to be a Police Officer III at Wilshire Area Vice where I functioned as an undercover operative targeting prostitution, gambling, bookmaking, and other Vice related offenses. While working Wilshire Vice, I was ambushed and received two gunshot wounds. I received the Purple Heart in 2010. Upon return from my injuries, I attended mandated Field Training Officer School and was assigned as a Field Training Officer (FTO) at Wilshire Division. I trained recruits upon their graduation from the Los Angeles Police Academy in tactics, use of force, report writing, vehicle stops, calls for service, court testimony, emergency procedures, pursuit policy, accident investigations, perimeters, Department policies and procedures, and effective communication skills. While assigned as a Field Training Officer, I was involved in an In-Policy Lethal Use of Force incident.

I was promoted to the rank of Detective and attended the LAPD Detective School. Upon completion of LAPD Detective School, I was assigned to Wilshire Area Narcotics, Field Enforcement Section, where I functioned in an undercover capacity.
I was promoted to the rank of Sergeant I and assigned to Hollenbeck Division. Prior to my assignment, I attended the mandated LAPD Supervisor School. In conjunction with

LAPD Supervisor School, I was selected to attend the West Point Leadership Academy Supervisor Training. The training focused on team building, leadership, and decision making. While assigned to Hollenbeck Division, I conducted roll call training on a daily basis on numerous subject matters to include Use of Force Options (Non-Lethal and Lethal), Tactics, Calls for Service, Calls for Service involving the Mentally Ill, Vehicle Pursuit Policy, LAPD Policies and Procedures, Use of Force Policy, Updated Legal Bulletins, Training Directives, and other Standardized Roll Call Training. I directly supervised Police Officers and provided supervisory oversight during calls for service, tactical situations, perimeter tactics, containment and control issues and use of force incidents. I conducted audits, personnel investigations, Standard Based Assessments (Ratings/Evaluations), Use of Force Investigations, Administrative Projects, and prepared commendations for Police Officer's field performance. While assigned to Hollenbeck Division, I was selected as the Officer-In-Charge of Hollenbeck Division's Special Enforcement Group, (SEG). I directly supervised (14) Police Officers and Detectives assigned to the Unit. SEG worked in conjunction with Hollenbeck Detectives and specifically targeted career criminals in Hollenbeck Division. I provided ongoing mandated Department Training as well tactical, firearms, less than lethal force, lethal force and search warrant tactics training to Police Officers and Detectives. SEG prepared and served numerous search warrants. I provided search warrant tactical briefing and de-briefing of each warrant at the conclusion of the search warrant service. I completed audits, administrative projects, Use of Force Investigations, personnel complaints, and other administrative duties as deemed necessary by the Area Commanding Officer.

During this time, I was assigned to Internal Affairs Division (IAD), Headquarters Section. I investigated personnel complaints that exceeded the scope for a geographical Division. At the conclusion of my assignment to IAD, I was selected to Management Services Division, Special Projects, Office of the Chief of Police. I completed numerous in-depth staff projects for review by the Chief of Police. In addition, I conducted research and edited the 2000 LAPD Department Manual.

Also, during this time, I earned my Master's Degree in Public Administration from California State University, Long Beach.

I was selected as a Sergeant II at 77th Division Vice. I directly supervised (10) undercover Vice Officers and four uniformed Police Officers. I provided all facets of training to the Police Officers assigned to Vice to include Use of Force Policy, Legal Updates, Department Directives, Training Bulletins, Standardized Roll Call Training, Tactics Training, Undercover Operations Training, Surveillance Training, and any other

training deemed necessary by the Area Commanding Officer. I conducted audits, personnel investigations, administrative projects, Use of Force Investigations, and special projects.

During this time, I was selected by the Chief of Police to be loaned to the Rampart Corruption Task Force. I conducted Use of Force audits and Internal Affairs Audits on Specialized Units in Central Bureau and South Bureau.

In 2000, I was selected to Metropolitan Division K9 Platoon as a Sergeant II+1. I directly supervised (16) K9 Handlers. Metropolitan Division K9 conducted K9 searches for the entire Department covering all Patrol Divisions and Specialized Units. I provided all facets of training to the K9 Officers to include K9 Operations, tactics, search warrant services, Mobile Field Force Options, Less than Lethal Force Options, Lethal Force Options, Department Directives, Training Bulletins, and other training dictated by the Officer-in-Charge and Commanding Officer. In addition, I taught K9 Operations at LAPD In-Service Training, Watch Commander School, Sergeant School, Field Training Officer (FTO) School and Detective School. While assigned to K9, I investigated and completed K9 contacts (bite investigations), personnel complaints, and Use of Force Investigations. In addition, I directed and was directly involved in Use of Force incidents. I received the LAPD Medal of Valor and LAPD Police Star for two lethal use of force incidents while assigned to K9.

In 2005, I was selected as a Sergeant II+1 in Special Weapons and Tactics (SWAT). I directly supervised (60) SWAT Officers. I conducted and facilitated all facets of SWAT training to include Weapons Training (.45 caliber, MP-5, M-4, Benelli Shotgun, Remington 870 Bean Bag Shotgun, .40mm, 37mm, X-26 Taser) on a monthly basis. In addition, I facilitated and conducted training in the following training Cadres: Breacher (Explosive), Crisis Negotiation-Mental Health, MEU, SMART, Suicide Prevention, Counter-Terrorism Cadre, Climbing, Hostage Rescue, Sniper Training, Air Support Training (Fast Rope, Aerial Platform Shooting). I directly supervised SWAT missions and High-Risk Search Warrant Services to include all facets (preparation, briefing, deployment, de-briefing). I was the Supervisor-in-Charge of the Crisis Negotiation Team, (CNT). I provided on-going Crisis Negotiation Training, mental health training, Tactical de-briefs of SWAT incidents, 40-hour POST Certified CNT School, and suicide prevention training. I worked in conjunction with the mental health community to provide and facilitate training with LAPD SMART, LAPD Mental Evaluation Unit (MEU), Behavioral Science Services Section (BSS), and Didi Hirsch Suicide Prevention

Training. In addition, I assisted the West Point Military Academy with the development of their crisis negotiation curriculum.

During this time, I was selected as the LAPD SWAT representative to respond to Mumbai India with LAPD Counterterrorism and Las Vegas Metropolitan Division Police Department Counterterrorism following the terrorist attack in November 2008. I taught use of force, tactics, and SWAT deployment to 250 Mumbai Special Tactical Police Officers. Upon my return, I assisted with the development of Multi-Assault, Counter-Terrorism Action Capabilities, (MACTAC).

In June 2010, I retired from the Los Angeles Police Department with over 20 years of service to pursue an opportunity in the private sector. I held supervisory positions for the last 14 years of my career. During my tenure with the LAPD, I received over 100 Commendations including: The Medal of Valor, Purple Heart, and the Police Star.

From June 2010 through April 2013, I was the Vice President of Security Operations at Caruso Affiliated in Los Angeles, CA. My responsibilities included identifying and conducting Risk and Vulnerability Assessments for all Caruso Affiliated Developments, projected developments/investments, and residences. I utilized strategic-level analysis from the intelligence community, law enforcement and the private sector. I identified and monitored potential or actual incidents among critical infrastructure domains and all personal and professional interests of Caruso Affiliated. I mitigated expected threats. I utilized preplanned, coordinated actions in response to infrastructure warnings or incidents. I responded to hostilities. I identified and eliminated the cause, or source, of an infrastructure event by the utilizing emergency response measures to include on-site security personnel, local law enforcement, medical and fire rescue, and relevant investigative agencies. I conducted all facets of security training for the company and employees. I formulated Business Continuity and CEO Succession Plans for the company and all affiliated business interests. I conducted ongoing audits and internal investigations.

From June 2013 to June 2014, I was hired as a Deputy Sheriff at the Riverside Sheriff's Department where I conducted all facets of patrol service to include calls for service, self-initiated field activity, arrests, citations, and court testimony. In addition, during my tenure with the Riverside County Sheriff's Department, I was assigned to Robert Presley Detention Center (RPDC). I processed and monitored inmate population from initial intake, housing, court, transportation, and release. I conducted searches of inmate population as well as the facility on an ongoing basis. I utilized my experience as a gang officer, Detective and

Sergeant with LAPD to conduct interviews and interrogations of prisoners regarding a myriad of investigations. I provided information to Gang Detail. I functioned as a mentor to newly appointed Deputy Sheriffs as well as Supervisors. I attended and certified in RSO Supplemental Jail Operations Core Course prior to deployment at RPDC. I attended on-going training to include Use of Force (Lethal and Non-Lethal), Crisis Negotiation Training, Active Listening Skills Training, Report Writing, Response and Deployment to Critical Incidents and Proper Protocols and Procedures when responding to a medical incident or suicide.

From June 2014 to March 2016, I was the Director of Security at Universal Protection Service where I supervised 84 Security Professionals at the City National Plaza. I conducted and facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. I ensured all Security Professionals were compliant with BSIS security training and licensing. I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments of the City National Plaza to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED) and protocols to respond and mitigate threats. I developed Security and Fire Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis.

From March 2016 to September 2017, I was the Director of Security at L&R Group of Companies. I conducted Risk and Vulnerability (RAV) Assessments for all L&R Group of Companies developments and projected developments throughout the United States. I conducted and/or facilitated all Bureau of Security and Investigative Services (BSIS) training to Security Professionals. I ensured all Security Professionals were compliant with BSIS security training and licensing. I conducted the following training to Security Professionals and Tenants on an ongoing basis: Fire Life Safety, Evacuation Drills, Active Shooter, Workplace Violence, Security Procedures and Protocols, Responding to Incidents Involving the Mentally Ill, Hazardous Materials and Internal Theft. I conducted ongoing Risk and Vulnerability Assessments to include security staffing and deployment, Closed Circuit Television (CCTV), Crime Prevention through Environmental Design (CPTED), and protocols to respond and mitigate threats. I developed Security and Fire

Life Safety Manuals for Security Professionals and Tenants. I coordinated all security efforts to ensure safety at Special Events. I conducted internal investigations and worked in conjunction with the Los Angeles Police Department (LAPD) and the Los Angeles Fire Department (LAFD) on an ongoing basis as well as respective law enforcement agencies throughout the United States on security matters.

In 2020, I received my Master of Legal Studies from Pepperdine Caruso School of Law.

Attached are my curriculum vitae, listing of testimony and fee schedule.

Scott A. DeFoe